1

1 - 14

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       )
                  Plaintiff,    )
                                )
-V-                             )   CRIMINAL DOCKET NO.
                                )   04-10160-WGY
GEORGE MONTILLA, a/k/a Jose,    )
                  Defendant.    )

DETENTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

June 23, 2004

Boston, Massachusetts

For the United States:

   KEVIN P. McGRATH, ESQ.
   Assistant U.S. Attorney
   Office of the United States Attorney
   1 Courthouse Way
   Boston, MA  02210
   (617) 748-3100

For the Defendant:

   RONALD IAN SEGAL, ESQ.
   23 Central Avenue
   Suite 605
   Lynn, MA  01901
   (781) 599-2800

Proceedings recorded by electronic sound recording,
transcript produced by Apex Reporting.

*APEX Reporting*
(617) 426-3077

1            P R O C E E D I N G S

2

3         THE CLERK:  June 23, the year 2004, in the matter
4    of The United States of America v. George Montilla, Criminal
5    Case No. 2004-10160-WGY.  Counsel, please identify
6    themselves for the record.
7         MR. MCGRATH:  Good afternoon, Your Honor.  Kevin
8    McGrath for the United States.
9         MR. SEGAL:  Good afternoon, Your Honor.  Ronald
10   Segal, S-E-G-A-L, on behalf of the defendant.  May I address
11   the Court, please?
12        THE COURT:  Please.
13        MR. SEGAL:  There's no interpreter present.  That
14   --
15        THE COURT:  We have a problem.
16        MR. SEGAL:  Well, I don't know if -- if Your Honor
17   would be inclined to accept this.  I know that Mr. Montilla
18   would.  The lady that has come with me is a certified
19   interpreter.  She works now in my office.  She was the head
20   of the bilingual school program in the city of Lynn for more
21   than 20 years.  She certainly is capable to do it.  I don't
22   know if that's permissible or not.
23        THE COURT:  Does the government have any
24   objection?
25        MR. MCGRATH:  No, Your Honor.

3

| | |
|---|---|
| 1 | THE COURT: We're not taking evidence, now? |
| 2 | MR. SEGAL: No. |
| 3 | THE COURT: Just arguments? |
| 4 | MR. SEGAL: And if Your Honor wishes, she can |
| 5 | certainly better state her credentials. |
| 6 | THE COURT: Okay. Why don't we do that then. |
| 7 | MR. SEGAL: Thank you, Your Honor. |
| 8 | (Pause.) |
| 9 | THE COURT: Would you state your name and just |
| 10 | give us some background? |
| 11 | THE INTERPRETER: Yes, Your Honor. My name is |
| 12 | Ellen Kelleher. |
| 13 | THE COURT: Ellen? |
| 14 | THE INTERPRETER: Kelleher, K-E-L-L-E-H-E-R. I |
| 15 | was employed by the Lynn Public Schools for 24 years. I |
| 16 | retired in February, as the bilingual chairperson for the |
| 17 | Special Education Department. I'm a certified bilingual |
| 18 | teacher in three areas, plus I passed the bilingual exam and |
| 19 | was certified by the Board of Education in Massachusetts. |
| 20 | THE COURT: Okay. |
| 21 | THE INTERPRETER: And I've been doing legal |
| 22 | translation for about 15 years with Mr. Segal. |
| 23 | THE COURT: Okay. And just for the record, what |
| 24 | languages? |
| 25 | THE INTERPRETER: I speak Spanish, English, |

1  French, Portuguese.
2           THE COURT:  And as I understand it, the defendant
3  is willing to proceed today with Ms. Kelleher as the
4  translator?
5           THE INTERPRETER:  (Speaking in Spanish.)
6           THE DEFENDANT:  (Speaking in Spanish.)
7           THE COURT:  Mr. Montilla, are you prepared to
8  proceed today with Ms. Kelleher serving as the interpreter?
9           THE DEFENDANT:  Si.
10          THE INTERPRETER:  Yes.
11          THE DEFENDANT:  Yeah.
12          THE COURT:  Thank you.  And the government has no
13 objection, so we will proceed on that basis.  And thank you,
14 Ms. Kelleher.  All right, Mr. Segal, let me hear from you on
15 the merits.
16          MR. SEGAL:  Please, Your Honor.  Thank you.
17          I agree with the accuracy of the input in the
18 pretrial services report.  I disagree, of course, with its
19 conclusion for detention.  There's only one aspect of it
20 that I would like to address.
21          There's a section in here that discusses his
22 status in the United States.  Apparently, his legal status,
23 which he claims has not been able to be confirmed by
24 pretrial services.  He tells me that he does, indeed, have a
25 green card or had a green card, which was seized by the

1  agents at the time of his arrest, along with his passport.
2          Ms. Sandra Reid who's referred to as furnishing
3  verification in this report is present in the courtroom and
4  I've spoken to her.  She has also seen that green card a
5  number of times.  That, of course, would be easily
6  confirmable.
7          I'd suggest, Your Honor, that in the scheme of
8  this case that Mr. Montilla is one of the peripheral players
9  and has had virtually nothing to do with the kingpin, the
10 target, Mr. Rosario, who is the target of the two telephone
11 intercept orders.
12         This man is characterized in the affidavit of the
13 agent at pages 6 and 7, as being an associate of Castro.
14 And I take it, by the context of everything, to be an
15 underling of a Luis Castro, who the government, I believe is
16 of the opinion that stood in for Mr. Castro, when Mr. Castro
17 was away.  And I know that Mr. Castro has not been ordered
18 detained and I -- it seems to me through the tenor of the
19 discovery materials that the government is alleging almost
20 identical roles of these two men.
21         I realize that there are personal differences
22 there.  But this -- this man comes in at 38 years old, with
23 no prior criminal history, at all.  We had a rather lengthy
24 preliminary hearing.  And if I may refer to that for a
25 moment, Count Two of the indictment is a forfeiture count.

1  And I suggest that the evidence came out during that hearing
2  that the stop of that car and the search of Mr. Montilla's
3  person is a patently unlawful search, which may doom that
4  count to failure.
5         While he hasn't had employment available to him in
6  this immediate area, he's a skilled butcher. His father was
7  a professional butcher. He worked in the Dominican
8  Republic, as a hotel butcher and as a market butcher. And
9  of course, he has those skills.
10         I have in my hand, if I may pass it up in a
11  moment, a very short letter from El Rico Supermarket, who
12  would employ him, if he is released.
13         Ms. Reid, who is his girlfriend --
14         THE COURT: (Unintelligible) said that he's been
15  unemployed, though, if I read this --
16         MR. SEGAL: Well, he worked for construction
17  companies when he was living in Texas, but has not been
18  employed since being in the Lawrence area. But he does now
19  have employment in his trade that's available to him
20  immediately. And if -- shall I pass that up, at this time?
21         THE COURT: Yes, please.
22         MR. SEGAL: Thank you.
23         (Pause.)
24         MR. SEGAL: Mr. McGrath has seen this.
25         THE COURT: I don't seem to have the affidavit

1   with me.  I don't know why.

2           (Pause.)

3           MR. SEGAL:  If I may continue just a bit, Your
4   Honor, I'll be --

5           THE COURT:  Please.

6           MR. SEGAL:  -- uncharacteristically brief here.

7           I'm going to ask the Court to consider releasing
8   this man, who doesn't have any record, on a combination of a
9   $20,000.00 cash bail, which both his family and Ms. Reid's
10  family, I understand could pool together and raise for him.
11  She would be willing to sponsor him and be responsible for
12  him.  She works for a real estate firm in Lawrence, is
13  gainfully employed, and is seeking to get her broker's
14  license at this time.

15          They had been living together for approximately
16  eight months.  And to couple that amount of bail with some
17  extremely restrictive restrictions; namely, the sponsorship,
18  a work requirement, a curfew, and electronic monitoring.
19  The agents have his green card.  They also have his
20  passport.

21          So it seems to me, although pretrial services is
22  concluding that his mother and father still live in the
23  Dominican Republic -- he has a number of children there and
24  some siblings, although, he has some siblings in the United
25  States, as well -- that there's a risk of flight.  But if

1   he's electronically monitored and doesn't have a passport
2   and doesn't presently have a green card, then there's an
3   impossibility that he can go anywhere.
4           THE COURT:  He'd need to have his green card back
5   to be employed, right?
6           MR. SEGAL:  Well, what I would ask of the U.S.
7   Attorney's Office is that that green card be returned to him
8   and that it be photocopied.  And I would stipulate that the
9   original was taken from him.
10          What I'm asking for, in effect, Your Honor, is
11  that -- is almost a form of house arrest, except for the
12  purposes of conferring with counsel and working.  And he is
13  willing to accept and abide by any and all conditions, no
14  matter how onerous they are.
15          I have had a great deal of occasion to speak to
16  Ms. Reid.  I'm very impressed by her.  They seem to have a
17  very close relationship.  And I guess I could conclude with
18  suggesting that at least at this stage, from what I'm seeing
19  here, it's not a large magnitude case and this man is not
20  one of the major players.
21          Thank you very much, Your Honor.
22          THE COURT:  Thank you.  Mr. McGrath?
23          MR. MCGRATH:  Your Honor, the government is
24  strongly opposed to this request.  The defendant is charged
25  in the indictment with conspiracy to distribute cocaine.

1  He's facing a mandatory minimum ten year term of
2  imprisonment and he'd be subject to deportation, whether or
3  not he's a resident alien.
4       He's got minimal contacts, at best, to this
5  district. He's not a U.S. citizen. He claims he's got an A
6  Card here. I will confirm that with the Court, if the Court
7  requests. But frankly, given all the other evidence
8  militating against release, I would argue that whether he's
9  a resident alien or not, is totally irrelevant here.
10      I do have a packet of documents that were Xeroxed
11 by D.E.A., when the defendant was arrested. I've looked at
12 them now, and I don't see a copy of the green card here.
13 That doesn't mean that there may not be one. I will check.
14 But my argument is that that's really irrelevant for the
15 following reasons.
16      Whether he's got a resident alien card or not,
17 he's not a U.S. citizen, he's subject to deportation. He's
18 got no documented record of employment in this country.
19 He's got no assets in this country. He's got no steady
20 place of employment. He claims he's been with this woman
21 for eight months, that may be the case, she may be very well
22 intentioned. She may love him. But this man has a history
23 of abandoning women. He admits to having six different
24 children by four different women, all of whom are in the
25 D.R..

1    I think this Court can place absolutely no
2 confidence in his commitment to this woman or to any
3 responsibility that he'd have to her, if you were to set any
4 conditions of bail.  In addition, all of his family contacts
5 are essentially in the Dominican Republic.  His two parents
6 live there.  He's got two siblings there.  The six children
7 that he's fathered live there.  He does have two siblings in
8 Texas, but that's no guarantee he's going to show up here.
9    In addition, Your Honor, he has access, the
10 government would argue, to large quantities of cash.  One of
11 the documents that was seized from the defendant and
12 submitted to this Court, in connection with the detention
13 hearing, was a document that the agent characterizes as a
14 drug ledger, which indicated $381,000.00 in monies that had
15 been collected.  And then right underneath that was a
16 notation, 'Police' $7,100.00.
17    As the Court may recall, at the car stop that
18 Mr. Segal referenced, $7,100.00 was seized from this
19 defendant, after he had met with Juan Rosario, the leader of
20 the conspiracy.  It was the government's position that that
21 was partial payment that Mr. Montilla was collecting for
22 approximately a kilogram of coke that had been previously
23 delivered.
24    And by fair inference, Your Honor, we would argue
25 that that $381,000.00, right above that, was $381,000.00 in

1  drug proceeds. Which if you take an estimate of $25,000.00
2  a kilogram, it works out to about 33 kilograms of cocaine
3  that had been distributed, for which these monies were being
4  collected.
5      So this man has access or has had access to large
6  quantities of cash. In addition, Your Honor, the conditions
7  of release proposed would be absolutely no guarantee that he
8  would show up. There's a proposal of electronic monitoring,
9  but there's also a request that he go to work. That's not
10 workable. If he's going to leave for even a moment, I
11 submit this man will flee.
12     He's got no family here. He's got no documented
13 residence, employment, assets, no commitment to any woman --
14 certainly, not someone he's met for eight months. And I
15 submit that if you release this man, he will be gone and
16 we'll never see him again. And there's no logical reason
17 why he'd show up to face these charges. So we're opposed to
18 this request.
19
20     THE COURT: Would you just do me a favor. Would
21 you just summarize, briefly, his role in this. The hearing
   took place a while ago.
22
23     MR. MCGRATH: Your Honor, the role -- in summary,
24 this was a wiretap case, if the Court may recall. We
25 intercepted calls from an individual by the name of Castro
   to Juan Rosario, who's the leader of the conspiracy. During

APEX Reporting
(617) 426-3077

12

1  those calls, Mr. Castro said that he would be having his
2  associate call Rosario to collect the tickets and that they
3  were going to be expecting nine.
4      Then shortly after that, Mr. Montilla starts
5  calling Mr. Rosario. And essentially, for a period of time
6  in March of this past year, there were numerous calls
7  between Montilla and Rosario regarding monies that Rosario
8  owed to Montilla and Castro. It was after one of those
9  meetings that we seized the $7100.00 from Mr. Montilla.
10     Following that, there was another series of calls
11 that the government submitted suggested that there had been
12 a delivery of a kilogram of cocaine by Mr. Montilla to
13 Rosario, who in turn, transferred it to a person by the name
14 of Velasquez. And then over the next week or so, in March
15 of this year, there were numerous calls with increasing
16 urgency by the defendant to Rosario, seeking the payment of
17 money owed for that quantity of drugs. And that culminated
18 in the end of March, with Mr. Velasquez returning
19 approximately a hundred grams of cocaine to Rosario, which
20 was seized and then the defendant Montilla showing up
21 outside of Jimenez's grocery store, after a series of phone
22 calls where it was clear he was coming to accept payment.
23     Agents go inside the grocery store and seize
24 approximately $14,000.00 in cash, all from Mr. Rosario.
25 Which during that morning and preceding day, we had numerous

1   calls regarding Rosario's efforts to collect that money to
2   pay off Mr. Montilla. So we had $14,000.00 that we submit
3   was going back to Mr. Montilla, plus the $7100.00 that he'd
4   already pocketed. So our evidence is that he was involved
5   in between one and two kilos during the short time we were
6   up on the wire, being distributed to the lead defendant and
7   the money being collected by him for those two kilos.
8            THE COURT: All right. I'm going to take the
9   matter under advisement. I do want to straighten out his
10  status. I do want the information that you have on his
11  status. I'm also going to ask pretrial services to just
12  find out what this potential employment (unintelligible).
13  All right. I need to review this. It's been a while.
14  Okay?
15           MR. SEGAL: Thank you very much, Your Honor.
16           MR. MCGRATH: Thank you.
17           THE COURT: The defendant needs to remain in
18  custody, until a decision is made.
19           MR. SEGAL: Thank you.
20           THE COURT: All right.
21           MR. MCGRATH: Thank you.
22           THE COURT: Thank you.
23           THE CLERK: Court is in recess.
24           (Whereupon, the hearing was concluded.)

APEX Reporting
(617) 426-3077

## CERTIFICATE OF TRANSCRIBER

This is to certify that the attached proceedings before: <u>U.S. DISTRICT COURT, DISTRICT OF MASSACHUSETTS</u> in the Matter of:

```
UNITED STATES OF AMERICA,      )
                  Plaintiff,   )
                               )
-V-                            )   CRIMINAL DOCKET NO.
                               )   04-10160-WGY
GEORGE MONTILLA, a/k/a Jose,   )
                  Defendant.   )
```

Place:  Boston, Massachusetts

Date:   June 23, 2004

Were held as herein appears, and that this is the true, accurate and complete transcript prepared from the recordings taken of the above entitled proceeding.

J. Mocanu                                01/19/05
Transcriber                              Date

*APEX Reporting*
(617) 426-3077