UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 04-10160 (WGY) |
| ) | |
| v. ) | |
| ) | |
| JUAN ROSARIO, ) | |
|    a/k/a "Carlos Castro; ) | |
| JAVIER TORRES-ESPINO, ) | |
|    a/k/a "Danny" ) | |
| GEORGE MONTILLA, ) | |
|    a/k/a "Jose" ) | |
| LUIS CASTRO, ) | |
|    a/k/a "Nene" ) | |
| RAMON VILLA, ) | |
|    a/k/a "Lorenzo VELASQUEZ ) | |
|    a/k/a "Ramon," ) | |
|    a/k/a "Jose Andino; ) | |
| ANSELMO DOMINGUEZ; ) | |
| CESAR MIRANDA, ) | |
|    a/k/a "Tutu;"     and ) | |
| PEDRO INFANTE, ) | |
|    a/k/a "Alex;" ) | |
| ) | |
|          Defendants. ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT MONTILLA'S MOTION TO SUPRESS FRUITS OF UNLAWFUL SEARCH AND SEIZURE

### INTRODUCTION

The United States of America, through its undersigned attorneys, hereby opposes Defendant George MONTILLA's ("MONTILLA") Motion to Suppress Fruits of Unlawful Search and Seizure. **MONTILLA**, a/k/a/ **"JOSE"**, seeks to suppress the $7160 cash found on him during a pat frisk conducted by Massachusetts State Trooper Jeffrey P. Boutwell ("Boutwell"), subsequent to the

stop of a tan Camry for revocation of registration. Defendant argues that nervous behavior is not enough to justify the pat frisk. Defendant fails to address the intercepted telephone conversations and subsequent surveillance by which Special Agent Christian Brackett ("Brackett") coordinated the stop of the Camry by State Troopers. This was not a mere random Terry stop followed by a pat frisk. Based on the following, law enforcement had probable cause to pat frisk **MONTILLA**: (1) voluminous wiretap coded and non-coded drug and drug money conversations of **MONTILLA** and others prior to the stop; (2) the close surveillances following these conversations and believed drug deals and money transfers; and (3) the money transfer on March 12th in which **MONTILLA** was surveilled at the money drop location, followed by the stop of the tan Camry, gave law enforcement probable cause to pat frisk **MONTILLA**. Thus, Defendant **MONTILLA**'s Motion to Suppress Evidence should be denied.

## FACTS

The facts supporting the stop of the tan Camry and the subsequent pat frisk of **MONTILLA** are set forth in more detail in the complaint affidavit of DEA Special Agent Christian Brackett, attached hereto as Exhibit 1 ("Brackett Affidavit"), and in the Affidavit of Massachusetts State Trooper Jeffrey P. Boutwell, attached as Exhibit 2.

In summary, this case arose from a DEA wiretap on two telephones used by **MONTILLA**'s co-defendant Juan ROSARIO ("ROSARIO"); monitoring of Target Telephone #1 began on February 13, 2004 and monitoring of Target Telephone #2 began on March 13, 2004. Monitoring of both telephones ceased on March 31, 2004.

On March 5, 2004, as set forth more fully in the Brackett Affidavit, ¶¶ 92-98, ROSARIO called VELASQUEZ. During the call, at approximately 1:08 p.m., VELASQUEZ told ROSARIO that he needed "four hundred" in a hurry and would give the "tickets" back immediately. ROSARIO asked VELASQUEZ "what about 24 and 1/2", agents believe a reference to $24,500 for a kilogram of cocaine. In a later conversation that day, VELASQUEZ asked ROSARIO: "how much are you going to get me?" ROSARIO responded: "a full one." ROSARIO called **MONTILLA** after each of these conversations ROSARIO had with VELASQUEZ and agents believe **MONTILLA** was supplying ROSARIO who was supplying VELASQUEZ with a kilogram of cocaine ("a full one"). At approximately 1:55 p.m., surveillance observed ROSARIO enter JIMENEZ GROCERY on Park Street in Lawrence, Massachusetts, a store agents knew to be owned by ROSARIO in his girlfriend's name.

Later that day, surveillance saw a vehicle registered to LUIS CASTRO, **MONTILLA**'S associate. Agents knew from an intercepted conversation between CASTRO and ROSARIO that CASTRO was in the Dominican Republic at the time. In that conversation,

CASTRO told ROSARIO to deal with **MONTILLA**. The male from the red Chevy entered JIMENEZ GROCERY. Moments later, ROSARIO called VELASQUEZ and told VELASQUEZ: "come by and pick up your number." Agents believed that this conversation meant that **MONTILLA** had dropped off the kilogram of cocaine and that VELASQUEZ could pick it up. Approximately 15 minutes later, surveillance saw a male believed to be VELASQUEZ exit JIMENEZ GROCERY carrying a large paper bag and depart. Agents believed that VELASQUEZ had just picked up the kilogram of cocaine.

From March 9 to March 12, 2004, there were a number of intercepted conversations and surveillances described more fully in the Brackett Affidavit, ¶¶ 99-112, in which **MONTILLA**, ROSARIO, and VELASQUEZ were intercepted discussing when and how much VELASQUEZ would pay ROSARIO and thus **MONTILLA** back for what agents believe was the prior cocaine delivery. For example, on March 9th, surveillance saw ROSARIO enter JIMENEZ GROCERY. Later that day at 8:29 p.m., ROSARIO called VELASQUEZ and asked: "how much do you have?" VELASQUEZ answered "seven thousand pesos" and told ROSARIO: "this guy has to give me eight". ROSARIO then put **MONTILLA** on the telephone to talk to VELASQUEZ. VELASQUEZ told **MONTILLA**: "I'm here waiting for the guy that has to give me some money. I already have a portion at home." **MONTILLA** asked VELASQUEZ: "what time more or less?" and VELASQUEZ answered: "when he shows up, I'm not getting out here without that."

Soon after this call, surveillance saw two males arrive at JIMENEZ GROCERY, one who entered JIMINEZ GROCERY. Agents believed that the male who entered the store was **MONTILLA**. Agents followed the two drive from JIMENEZ GROCERY to **MONTILLA**'s home at 22 Hill Top Street, Lawrence, MA. Agents believe that **MONTILLA** had attempted to pick up some of the money owned by VELASQUEZ and ROSARIO for the prior cocaine delivery.

On March 11, 2004, at approximately 9:22 p.m., ROSARIO called VELASQUEZ. During the call, VELASQUEZ told ROSARIO: "I am going to resolve that for you. I had problems with the guy over there." VELASQUEZ further stated: "I am going to send you 8,000 pesos that I have at the house tomorrow." ROSARIO told VELASQUEZ: "I have a serious problem with those people and they said that they were going to be over there tomorrow at 10:00 a.m." ROSARIO told VELASQUEZ: "You should've called, even if it's not all complete, at least we can give them the 8." VELASQUEZ stated that he doesn't like "giving one thing now and another thing later." ROSARIO responded: "I'm still telling those people that you wouldn't do that to me. You and I have gone further." ROSARIO further stated: "these are good people. . . . people where we can continue to eat from. They have good stuff too." VELASQUEZ and ROSARIO agreed to meet the next day. SA Brackett believed that ROSARIO was advising VELASQUEZ to repay

5

the drug debt owed to ROSARIO and VELASQUEZ' suppliers because they supplied high quality drugs ("good stuff").

The next day, March 12, 2004, at approximately 9:00 a.m. surveillance was established in the vicinity of JIMENEZ GROCERY, 112 Parker Street, Lawrence, MA, in response to the call the night before.  Upon arriving at the business, S/A Brackett observed the Oldsmobile used by ROSARIO parked next to JIMENEZ GROCERY.  At approximately, 9:05 a.m., ROSARIO called VELASQUEZ, and VELASQUEZ agreed to meet ROSARIO at "the store", a reference agents believed to be JIMENEZ GROCERY.

At approximately 9:40 a.m., **MONTILLA** called ROSARIO.  During the call, ROSARIO told **MONTILLA**: "I got in touch with that person last night, a little while after I talked to you."  ROSARIO further stated: "He is coming to bring me something and I'll let you know."  This is a reference agents believe to VELASQUEZ coming to bring money to repay ROSARIO and then **MONTILLA** for the prior cocaine delivery.  **MONTILLA** told ROSARIO: "then I am going to tell those people not to come up here, because they were coming this way" (a reference agents believe to **MONTILLA**'s suppliers).

At approximately 10:15 a.m., SA Brackett observed VELASQUEZ enter JIMENEZ GROCERY and leave a few minutes later. Approximately a minute later, ROSARIO called **MONTILLA**.  During the call, ROSARIO told **MONTILLA**: "He just got here and gave me

five pesos (a reference to $5,000) and at seven, he is going to bring me another five." ROSARIO further stated: "he tells me that we are going to finish the day after tomorrow." **MONTILLA** told ROSARIO: **"I'm going to pick that up now**, I'm going to call these people to hold on." (Emphasis added).

At approximately 10:43 a.m., SA Gazzara observed a tan Toyota Camry (MA reg. 5475WP) (the same Camry parked in front of **MONTILLA**'s house on March 6th, the morning after the 1 kilogram deal, see Exh 1. ¶97), park next to JIMENEZ GROCERY on Bailey Street behind ROSARIO's gray Oldsmobile. SA Brackett then observed the individual he believed to be **MONTILLA**, wearing a leather jacket, walk from the Camry into JIMENEZ GROCERY. A registration check on the vehicle indicated that the Camry's registration was revoked due to insurance cancellation.

At approximately 10:50 a.m., SA Brackett observed a male previously seen entering JIMENEZ GROCERY, exit and leave in a black Ford Explorer, (MA Reg. 18JJ30), registered to Allon IUGI, park in front of JIMENEZ GROCERY. Moments later, SA Brackett observed **MONTILLA** exit the store and meet Pablo ROBLES outside JIMENEZ GROCERY. As the Camry passed Trooper Gondella, he observed three occupants in the Camry. Surveillance continued to follow the Camry to a parking lot where it briefly met the black Ford Explorer. Trooper Gondella contacted Trooper Jeffrey P. Boutwell to stop the Camry in connection with a narcotics

investigation for revocation of registration.  Trooper Gondella and SA Brackett maintained surveillance on the Camry.

At approximately 11:20 p.m., Trooper Boutwell stopped the Camry on Park Street and Exchange Street in Lawrence, MA driven by ROBLES.  Trooper Boutwell asked the driver for his license and registration.  He immediately produced his license and registration.  Both documents identified the driver as PABLO ROBLES.  Boutwell told Robles the reason he was stopped was because his registration had been revoked.  Boutwell asked the driver and the passengers some questions.  The three appeared nervous - instead of addressing Trooper Boutwell, they looked at each other and spoke Spanish in low tones.  They did not look at Boutwell directly.  Boutwell asked the other two occupants for identification which they produced, identifying them as Eligio Rolfott (surveilled on March 9th with **MONTILLA** during a believed drug money pick-up, Exh. 1, ¶¶ 104) and **MONTILLA**.  Boutwell returned to his patrol car and called in to request to have the Camry towed.

After obtaining identification from the occupants, Trooper Boutwell asked each one to exit the vehicle.  While conducting a pat frisk of **MONTILLA**, Trooper Boutwell found $5000.00 in his jacket pocket and another $2,150.00 in his front pants pocket.  At Trooper Boutwell's request, a Lawrence, MA Police Officer arrived on scene, who was fluent in the Spanish language.  When

**MONTILLA** was questioned about the $7,150.00 in United States Currency that he was carrying around in his pockets, **MONTILLA** stated that he had saved the money over the last two months, working as a cab driver and in the construction business pouring concrete. Trooper Boutwell informed **MONTILLA**, through the Spanish interpreter, that the money was being seized as suspected drug proceeds and gave **MONTILLA** a receipt. Later, Trooper Boutwell met with SA Brackett and transferred the currency to SA Brackett who processed it as a drug proceeds.

## ARGUMENT

The Supreme Court has clearly stated that "the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." United States v. Bouffard, 917 F.2d 673, 675-76 (1st Cir. 1990) (citing Rakas v. Illinois, 439 U.S. 128, 131 (1990)). Defendant **MONTILLA** has failed to satisfy this burden as set forth below, failing to even address the intercepted telephone conversations and surveillances described above and in the Affidavit of S/A Christian Brackett, from which Brackett directed that the brown Camry in which **MONTILLA** was an occupant, be pulled over by a State Trooper.

Defendants have not made a sufficient showing to even require an evidentiary hearing. "Evidentiary hearings on motions

to suppress are required only where a defendant makes a sufficient showing. . . . The burden is on the defendant to allege facts 'sufficiently definite, specific, detailed, and non conjectural, to enable the court to conclude that a substantial claim is presented.'" United States v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996) (citing United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994) (holding no hearing was required as defendants' affidavits in support of motion to suppress did not allege facts that were sufficiently definite, specific, detailed and thus the factual matters were essentially uncontested)).

**MONTILLA** has failed to file affidavits regarding the wiretap conversations or surveillances or addressed these facts at all in this Motion. Thus, the factual matters are uncontested by Montilla and no hearing is required.

**THERE WAS AMPLE PROBABLE CAUSE FOR THE PAT FRISK AND SUBSEQUENT SEIZURE OF THE $7,160 FOUND ON MONTILLA**

Based on the weeks of wiretap conversations and surveillances, law enforcement had probable cause to search **MONTILLA** on March 12th. United States v. Capelton, 350 F.3d 231 (1st Cir. 2003); United States v. Badalamenti, 1985 U.S. Dist. LEXIS 15819, *30; 1985 WL 2572 (holding coded wiretap conversations, surveillances and agent opinion as to practices of drug dealers constituted probable cause for search). The police were justified in a belief that fruit of the criminal activity,

10

such as drug money, or evidence of drug activity was likely in **MONTILLA**'s possession. See Capelton, 350 F.3d at 240-41; Badalamenti, 1985 U.S. Dist. LEXIS 15819, *30; 1985 WL 2572 ("Moreover, the nature of the illegal activity shown supported the likelihood that the defendants would have instruments, proceeds or evidence of the narcotics and money laundering operations in their homes, cars and businesses."). Furthermore, "Use of coded language supports a probable cause finding." United States v. Lopez, 1997 U.S. Dist. LEXIS 139; 611997 WL 567937; (N.D.N.Y. 1997) (citing United States v. Cancelmo, 64 F.3d 804, 808 (2d Cir. 1995)).

It is clear, and defendant does not contend otherwise, that law enforcement did not need a warrant to conduct this search in light of the "exigent circumstance" that **MONTILLA** was mobile at the time and this created a risk that the evidence would be "spirited away." Capelton, 350 F.3d at 241. "As the Supreme Court has repeatedly noted, common sense and practical considerations must guide judgments about the reasonableness of searches and seizures." United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002).

It is also well settled that "knowledge may be imputed from the DEA agents to the state police who actually effectuated the stop under the fellow officer rule." United States v. Capelton, 350 F.3d 231 (1st Cir. 2003) (citing United States v.

11

Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999) ("[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation."); see also Cook, 277 F.3d at 86. Thus, the knowledge of SA Brackett and other surveillance agents can be imputed to Boutwell who made the car stop at Brackett's direction.

From March 9th to 12th, law enforcement intercepted numerous conversations in which **MONTILLA**, ROSARIO, and VELASQUEZ discussed Velesquez' efforts to pay for the prior cocaine delivery, as described above. For example, on March 9, 2004, ROSARIO called VELASQUEZ and asked: "how much do you have?" VELASQUEZ answered "seven thousand pesos" and told ROSARIO: "this guy has to give me eight". ROSARIO then put **MONTILLA** on the telephone to talk to VELASQUEZ. VELASQUEZ told **MONTILLA**: "I'm here waiting for the guy that has to give me some money. I already have a portion at home." **MONTILLA** asked VELASQUEZ: "what time more or less?" and VELASQUEZ answered: "when he shows up, I'm not getting out here without that." Soon after this call, agents surveilled a male they believed to be **MONTILLA** at JIMENEZ GROCERY. This man drove with another to **MONTILLA**'s home at 22 Hill Top Street, Lawrence, MA. Agents believed that **MONTILLA** had attempted to pick up some of the money owned by VELASQUEZ and ROSARIO for the prior cocaine delivery.

Then, on March 12th, approximately 45 minutes before the stop of the tan Camry, at 10:16 a.m., ROSARIO told **MONTILLA** on the telephone: "He just got here and gave me five pesos and at seven, he is going to bring me another five." ROSARIO further stated, "he tells me that we are going to finish the day after tomorrow." **MONTILLA** told ROSARIO, "I'm going to pick that up now, I'm going to call these people to hold on." Approximately 30 minutes later, at 10:43 a.m., SA Gazzara observed a **MONTILLA** walk from the tan Toyota Camry and enter JIMENEZ GROCERY. At approximately 10:50 a.m., law enforcement saw **MONTILLA** exit JIMENEZ GROCERY and walk towards the tan Camry with Pablo ROBLES. Teams of surveillance agents continuously followed the tan Camry after it left the JIMENEZ GROCERY until it was stopped by Trooper Boutwell. (See Brackett Affidavit, ¶¶ 111-12).

"Probable cause for a search here is demonstrated by facts and circumstances . . . sufficient in themselves to warrant a man of reasonable caution in the belief that he was observing criminal activity and the fruits of criminal activity." Here, as in Capelton, law enforcement surveillance, coupled with previous identifications and background knowledge, provided sufficient probable cause to execute the search. 350 F.3d at 240-41.

Finally, defendant fails to cite even a single case involving wiretap conversations used, solely or in part, to establish probable cause for the pat frisk of defendant.

13

Defendant fails to address the wiretap conversations and close surveillance at all. MONTILLA's citations to the two District Court cases, and not First Circuit cases as MONTILLA asserts in his Motion, United States v. McKoy, 2004 WL 2851950 (D. Mass 2004) and United States v. Starks, 301 F.Supp.2d 76 (D. Mass 2004), are unavailing. Both cases involve Terry stops conducted the same day that police observed them, and do not involve any lengthy investigation and surveillances, certainly no wiretap conversations as in this case.

In the instant case, the officers had a very well-founded belief that payment for a previous cocaine deal had occurred at JIMENEZ GROCERY. Coupled with the information of the previous weeks of wiretap conversations and surveillances and **MONTILLA** and the two others' nervous behavior[1] in the tan Camry, gave law enforcement probable cause to search MONTILLA.

---

[1] See United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988) (holding well-founded suspicion of drug activity coupled with nervous behavior, gave a legitimate and specific concern for personal safety justifying pat frisk).

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress Evidence should be denied.

Dated: February 18, 2005

>                                  Respectfully Submitted,
>                                  MICHAEL J. SULLIVAN
>                                  United States Attorney
>
>                                  By: _____
>                                  CYNTHIA W. LIE
>                                  ASSISTANT U.S. ATTORNEY

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail on by _____

_____ 2/18/05
Assistant U.S. Attorney

Ian Segal
by Fedex w/
encl &
fax w/o
encl.